**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Rebekah Badilla, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>v.<br>Kenvue Inc. & Johnson & Johnson Consumer, Inc.,<br><br>Defendants. | Case No.<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Rebekah Badilla ("Plaintiff") brings this Class Action Complaint against Defendants Kenvue Inc. & Johnson & Johnson Consumer, Inc. ("Defendants"), individually and on behalf of all others similarly situated, and complains and alleges upon personal knowledge as to herself and her own acts and experiences and, as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## NATURE OF THE ACTION

1. Plaintiff brings this important consumer class action lawsuit on behalf of similarly situated consumers ("Class Members") who purchased for personal, family, or household use, Defendants' certain Band-Aid Bandage products (the "Products").[1] The Products contain per- and polyfluoralkyl substances ("PFAS"), a category of synthetic chemicals that are, by definition, artificial, and in April of 2024 have been designated by the Environmental Protection Agency ("EPA"), as hazardous substances under the Comprehensive Environmental Response,

---

[1] Band-Aid Flexible Fabric Comfortable Protection Bandages; Band-Aid OURTONE Flexible Fabric BR45 Bandages; Band-Aid OURTONE Flexible Fabric BR55 Bandages; Band-Aid OURTONE Flexible Fabric BR65 Bandages; and Band-Aid Water Block Tough-Strips Waterproof Adhesive Bandages.

Compensation, and Liability Act (CERCLA). The EPA determined that these chemicals meet the criteria for listing as hazardous constituents under RCRA because scientific studies show they have toxic, carcinogenic, mutagenic, or teratogenic effects on humans or other life forms.[2]

2.      PFAS are a group of synthetic, man-made, chemicals known to be harmful to both humans and the environment. Because PFAS persist and accumulate over time, they are harmful even at very low levels. Indeed, "PFAS have been shown to have a number of toxicological effects in laboratory studies and have been associated with thyroid disorders, immunotoxicity effects, and various cancers in epidemiology studies."[3]

3.      In fact, scientists are studying—and are extremely concerned about—how PFAS affect human health. Consequently, the CDC outlined "a host of health effects associated with PFAS exposure, including cancer, liver damage, decreased fertility, and increased risk of asthma and thyroid disease."[4]

4.      The International Agency for Research on Cancer ("IARC"), part of the World Health Organization, has classified PFOA as "carcinogenic to humans" based on sufficient evidence it can cause cancer in lab animals and strong evidence that it has some of the key properties of a carcinogen in people who are exposed to it.

5.      Among Defendants' countless recognizable products are their adhesive bandages, marketed under the trademarked name "Band-Aid." Band-Aid brand is one of the most

---

[2] *See* https://www.epa.gov/pfas/key-epa-actions-address-pfas#:~:text=Learn%20more%20about%20PFAS.,up%20PFAS%20contamination%20in%20communities.

[3] Nicholas J. Heckert, et al. "Characterization of Per- and Polyfluorinated Alkyl Substances Present in Commercial Anti-fog Products and Their In Vitro Adipogenic Activity," Environ. Sci. Technol. 2022, 56, 1162-1173, 1162.

[4] Harvard T.H. Chan Sch. Of Pub. Health, Health Risks of widely used chemicals may be underestimated (June 27, 2018), https://www.hsph.harvard.edu/news/hsph-in-the-news/pfas-healthrisks-underestimated/ (last visited Aug. 15, 2022).

recognizable brands worldwide today.  Millions of people use Band-Aids daily for the treatment of cuts, scrapes, and burns.

Defendant manufactures, sells, and distributes the Products using a marketing and advertising campaign centered around claims that appeal to health-conscious consumers. Despite the Products containing harmful PFAS, a known carcinogen, Defendants market the Products as offering "trusted protection" and "caring for your wound". The Products' labeling is depicted below:





6.     Defendants' extensive marketing efforts routinely tout their commitment to the health of their customers, communities, and our planet.  For example, Kenvue has a "sustainability promise" on its website, stating as follows:

> "We're all about careful choices. Choices that heal and contribute to the best possible outcomes—for our customers, the planet, and the society we live in. That's why we hold ourselves to the highest standards when making safe products for you. It's why we try to minimize our footprint on the planet and contribute towards progressing healthcare in the communities we are part of. And why we try—every day—to make choices that will create a future that's bright and healthy for all of us."

7.     The "sustainability promise" also states that the Band-Aid brand has "Better Ingredients, Better Processes," and they list the following statements in support of that promise:

- "We prioritize safety and quality in the development of every wound care product."

- "Every piece of material in our BAND-AID Brand bandages and every ingredient in our antibiotic treatments are chosen with safety as the top concern. We thoroughly vet each supplier and only partner with those who meet our rigorous standards."

- "Our over-the-counter active ingredients have proven to be the best quality through safety assurance processes and ongoing evaluation."

- "Our manufacturing facilities undergo regular audits and certification so that we can ensure our products are manufactured with the highest standards and comply with most discerning regulatory standards."

- "Our scientists ensure the safety and efficacy of our products through clinical studies and laboratory models."

8.     With such representations, Defendants have gained the trust and confidence of consumers, like Plaintiff, who reasonably believed that Defendants' Products are made with safe, high-quality materials, and can be used safely as intended.  However, the Products are not safe for

use since they contain PFAS which are a carcinogen and harmful to human health. Moreover, as delved intro in greater detail below, independent testing conducted by *Mamavation*, a "green" product investigation organization and network, found that the Products contains high levels of PFAS.

9.    Defendants are well aware that consumers are extremely health-conscious and concerned about the presence and use of PFAS chemicals in their products.

10.    Defendants know the importance of marketing and labeling, including the value of the label representations it carefully chooses for placement on the Products. Insofar as *PFAS* made its way into Defendants' Products on purpose, it should have been listed on the Product's labeling. Insofar as it made its way into the Products by accident, it follows that it was due to poor manufacturing processes by either Defendants and/or their agents.

11.    What Defendants have not told consumers, however, is that PFAS "forever chemicals," notorious for having adverse effects on humans and our environment, are present in unsafe amounts in Band-Aid brand adhesive bandages. Upon information and belief, Defendants have used and continue to use PFAS chemicals in their adhesive bandages for their water-proof qualities.

12.    PFAS is dubbed the "forever chemical" because it breaks down very slowly in the environment and can build up or bioaccumulate in people, animals, and the environment over time.[5] In fact, PFAS contains carbon fluorine bonds – one of the strongest in nature, making them highly persistent in the environment and in our bodies.[6]

---

[5] *Our Current Understanding of the Human Health and Environmental Risks of PFAS*, United States Environmental Protection Agency, https://www.epa.gov/pfas/our-current-understandinghuman-health-and-environmental-risks-pfas.

[6] U.S. Department of Health and Human Services, National Toxicology Program, https://ntp.niehs.nih.gov/whatwestudy/topics/pfas.

13.     Modern science has demonstrated that there is no "safe" level of exposure to PFAS chemicals.  Even "trace" levels of PFAS can be harmful to human health and our environment.[7]  Indeed, the State of New Jersey has set the maximum contaminant level for one particular PFAS, PFOA, at 14 parts per trillion, which is the equivalent of 14 drops of water in 20 Olympic-sized pools.  Such small quantities of PFAS are equally harmful when they are not ingested but, rather, are applied to the skin, because PFAS can be absorbed through the skin, the largest human organ.

14.     Defendants are well-aware that consumers are extremely concerned about the use of PFAS chemicals in their products, yet Defendants have continued to market and advertise their Band-Aid brand bandages using the representations described herein in order to profit off of unsuspecting and unwitting consumers.

15.     Had Defendants disclosed to Plaintiff and Class Members that their adhesive bandages contained and/or were at the risk of containing PFAS chemicals, Plaintiff and Class Members would not have purchased Defendants' adhesive bandages, or they would have paid significantly less for them.

16.     As a direct and proximate result of Defendants' failures, Plaintiff and the Class Members have suffered and will continue to suffer serious injury.

17.     Accordingly, Plaintiff, on behalf of herself and the estimated thousands—if not millions—of similarly situated consumers of Band-Aid adhesive bandages seeks to hold Defendants responsible for the injuries suffered as the result of their misconduct and failure to act, and demands appropriate monetary, equitable, injunctive, and declaratory relief. As a result of Defendants' misconduct, Plaintiff and putative Class Members have suffered injury in fact, including economic damages.

---

[7] *EPA warns toxic "forever chemicals" more dangerous than once thought*, Washington Post (June15, 2022), https://www.washingtonpost.com/climate-environment/2022/06/15/epa-pfas-foreverchemicals/.

18.     Plaintiff brings her claims against Defendants individually and on behalf of a Class of all other similarly situated for (1) violation of New York Gen. Bus. Law § 349, *et seq.*; (2) violation of New York Gen. Bus. Law § 350, *et seq.* and (3) unjust enrichment.

**PARTIES**

### A.  Plaintiff

19.     Plaintiff is a citizen and resident of the state of New York.  During the applicable statute of limitations period, Plaintiff purchased and used as directed Defendants' Band-Aid OURTONE Flexible Fabric BR45 and Band-Aid Water Block Tough-Strips Waterproof Adhesive Bandages Products, which testing confirmed contained PFAS.  More specifically, over the last two years, Plaintiff purchased Defendants' Products at various brick and mortar retail locations throughout Brooklyn, New York, including Walgreens.  Plaintiff purchased the Products because Plaintiff believed that the Products were safe for use on the human body and did not contain any harmful chemical such as PFAS that were not listed anywhere on the Products packaging.  If the Products did not contain and/or are not at the risk of containing harmful PFAS, Plaintiff would purchase the Products in the immediate future.

20.     Had Defendants included that the Products contain PFAS or are the risk of containing PFAS on the Products' packaging, Plaintiff would not have been willing to pay the same amount for the Products, and, consequently, would not have been willing to purchase the Products.  Plaintiff purchased, purchased more of, and/or paid more for, the Products than Plaintiff would have had Plaintiff known the truth about the Products.  The Products Plaintiff received were worth less than the Products for which Plaintiff paid.  Plaintiff was injured in fact and lost money as a result of Defendants' improper conduct.

### B.  Defendants

21.    Defendant, Kenvue Inc. is a corporation with its principal place of business in Skillman, New Jersey.  Defendant Kenvue Inc. (formerly the consumer healthcare division of Johnson & Johnson which has now spun-off to become its own company) is the current owner of the Band Aid brand.  Defendant Kenvue Inc. manufactures, markets, advertises, and distributes the Products throughout the United States.  Defendant Kenvue Inc. created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling for the Products.

22.    Defendant Johnson & Johnson Consumer, Inc. is a corporation with its principal place of business in Skillman, New Jersey.  Defendant Johnson & Johnson Consumer, Inc. is the former owner of the Band Aid brand.  Defendant Johnson & Johnson Consumer, Inc. manufactured, marketed, advertised, and distributed the Products throughout the United States during the Class Period.  Defendant Johnson & Johnson Consumer, Inc. created and/or authorized the false, misleading, and deceptive advertisements, packaging, and labeling for the Products.

23.    Johnson & Johnson Consumer Inc. is a New Jersey corporation and subsidiary of Johnson & Johnson, with principle executive offices located at One Johnson & Johnson Plaza, New Brunswick, New Jersey, upon information and belief of the Plaintiff.

**JURISDCTION AND VENUE**

24.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 of the Class Action Fairness Act of 2005 because: (1) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and (iii) there is minimal diversity because Plaintiff and Defendants are citizens of different states.

25.    This Court has personal jurisdiction over the Defendants because they transact business in this state and district, have substantial aggregate contacts with this state and district,

engaged in conduct that has and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to persons in this state and district, and because they purposefully availed themselves of the laws of the state of New York, and further because Plaintiff purchased the Products in this state and district.

26.     In accordance with 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the conduct giving rise to Plaintiff's claims occurred in this district, including Plaintiff's purchase of the Products, because Defendants transact substantial business in this district, and because Defendants have intentionally availed themselves of the laws and markets within this district.

## FACTUAL ALLEGATIONS

### *Defendants' Businesses*

27.     Incorporated in New Jersey in 1887, J&J and its subsidiaries have approximately 131,900 employees worldwide engaged in the research and development, manufacture, and sale of a broad range pf products in the healthcare field.

28.     According to J&J's Form 10-K filed with the Securities Exchange Commission for the fiscal year ended December 31, 2023, the company's primary focus is products related to human health and well-being.

29.     Kenvue was incorporated in Delaware in February 2022, as a wholly owned subsidiary of J&J, to serve as the ultimate parent company of J&J's Consumer Health Business.[8] In April of 2023, J&J completed the transfer of substantially all of the assets and liabilities of the Consumer Health Business to Kenvue and its subsidiaries.

---

[8] According to J&J's Form 10-K, aside from Consumer Health, its other two business segments are Pharmaceutical and Medical Devices.

30.     In May 2023, Kenvue completed an initial public offering and began trading on the New York Stock Exchange. Following the Kenvue IPO, J&J owned approximately 89.6% of its outstanding common stock; however, as part of an exchange offer J&J announced in July of 2023, under which its shareholders could exchange shares of J&J common stock for shares of Kenvue common stock, in August of 2023, J&J completed the exchange offer and thus the separation from J&J and transition to being a fully independent public company.[9]

31.     Following Kenvue's separation from J&J, J&J stated in its Form 10-K that it is now organized into two business segments: Innovative Medicine (focused on therapeutic areas, such as immunology, infectious diseases, oncology, and neuroscience) and Med. Tech. (includes a broad portfolio of products used in the interventional solutions, orthopaedics, surgery, and vision categories).

32.     Kenvue stated in its Form 10-K filed with the Securities Exchange Commission for the fiscal year ended December 31, 2023, "[w]ith $15.4 billion in net sales in 2023, we are the world's largest pure-play consumer health company."

33.     Kenvue further stated in its Form 10-K that its brand portfolio—consisting of BAND-AID Brand Adhesive Bandages, Tylenol, Neutrogena, Listerine, Johnson's, and others— allows it "to provide holistic consumer health solutions to our consumers across a spectrum of product categories and hold leading positions across numerous large and attractive categories globally.  These comprehensive solutions are backed by science and several of our brands have a long history of recommendations by healthcare professionals, which further reinforces our consumers' confidence in our brands."

---

[9] According to Kenvue's Form 10-K filed with the Securities Exchange Commission for the fiscal year ended December 31, 2023, J&J continues to own approximately 9.5% of Kenvue's outstanding common stock.

***PFAS Chemicals and Associated Risks***

34.     PFAS are a category of highly persistent and potentially harmful <u>man-made</u> <u>chemicals</u>.[10]PFAS are <u>not naturally occurring</u>.[11]  They were first developed by scientists in the 1940s and used in industry and consumer products because of its stain resistance, oil-resistance and water resistance properties.[12]  Thus, they are indisputably "artificial" and not "natural."

35.     How and why is PFAS getting into band aids?  Upon information and belief, PFAS chemicals are used by Defendants for their waterproof qualities and to increase wettability and penetration of the substrate, resulting in a stronger bond of the band aid to the skin.[13]

36.     The man-made PFAS chemicals, which are in the Products, are sometimes called "forever chemicals" because they bioaccumulate, or build up in the body over time.

37.     People may be exposed to PFAS through a variety of pathways, including ingestion, inhalation, and skin absorption. Studies dating back at least a decade have indicated that PFAS can be absorbed through skin, with evidence showing that PFAS in the blood increases after application to skin.

38.     Diet is considered a major route of PFAS exposure for humans, and reasonable consumers purchasing Products represented as natural would not expect them to contain harmful man-made chemicals, such as PFAS.[14]

39.     PFAS chemicals have been associated with a variety of negative health effects for humans and the environment.

---

[10] *PFAS Explained*, EPA, https://www.epa.gov/pfas/pfas-explained (last visited October 24, 2022).
[11] https://www.atsdr.cdc.gov/pfas/resources/pfas-faqs.html (Last accessed October 24, 2022)
[12] https://www.3m.com/3M/en_US/pfas-stewardship-us/pfas-history/ (Last accessed October 24, 2022).
[13] "BAND-AIDS" & BANDAGES WITH INCICATIONS OF PFAS "FOREVER CHEMICALS' REPORT https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html.
[14] *Dietary Habits Related to Food Packaging and Population Exposure to PFASs*, Environmental Health Perspectives, https://ehp.niehs.nih.gov/doi/full/10.1289/EHP4092 (Last accessed October 24, 2022).

40.     The EPA has identified that "[c]urrent peer-reviewed scientific studies have shown that exposure to certain levels of PFAS may lead to:" [15]

    a.  Reproductive effects such as decreased fertility or increased high blood pressure in pregnant women.

    b.  Developmental effects or delays in children, including low birth weight, accelerated puberty, bone variations, or behavioral changes.

    c.  Increased risk of some cancers, including prostate, kidney, and testicular cancers.

    d.  Reduced ability of the body's immune system to fight infections, including

    e.  reduced vaccine response.

    f.  Interference with the body's natural hormones.

    g.  Increased cholesterol levels and/or risk of obesity.

41.     A figure from the European Environmental Agency ("EEA") shows the "[e]ffects of PFAS on human health:" [16]

---

[15] https://www.epa.gov/pfas/our-current-understanding-human-health-and-environmental-risks-pfas

[16] *Emerging chemical risks in Europe — 'PFAS'*, EUROPEAN ENVIRONMENT AGENCY (Dec. 12, 2019, last modified Mar. 9, 2021) https://www.eea.europa.eu/publications/emerging-chemical-risks-in-europe.



42.     The EEA article further explained that "[p]eople most at risk of adverse health impacts are those exposed to high levels of PFAS, and vulnerable population groups such as children and the elderly."[17]

43.     The danger of PFAS chemicals is well known.  On September 20, 2020, a *New York Times* article titled, "These Everyday Toxins May Be Hurting Pregnant Women and Their Babies",

_____

[17] *Id.*

reported on the dangers of PFAS—particularly during gestation and in early childhood development:[18]

44.    As a result, the state of New York has enacted a ban on the sale of any food packaging which contains intentionally added PFAS.

45.    Scientists think these widely used industrial chemicals may harm pregnant women and their developing babies by meddling with gene regulators and hormones that control two of the body's most critical functions: metabolism and immunity.[19]

46.    There is no effective treatment for removal of PFAS chemicals from the body. Therefore, experts agree that the most effective strategy to decrease health risk is to avoid and/or limit exposure to products known to contain PFAS chemicals.

47.    According to the Environmental Protection Agency ("EPA"), limiting exposure to PFAS can help protect individual health.  "Because certain PFAS are known to cause risks to human health, the most important steps you and your family can take to protect your health is to understand how to limit your exposure to PFAS by taking [steps to] reduce possible exposure during daily activities."[20]

48.    Only over the past few years, the presence of PFAS used in consumer products, and their consequent risks, began to be publicized and discussed in the media and scientific literature. Because of this newly available information, consumers are rightfully and extremely concerned about the presence or risk of PFAS in consumer products, especially ones like band aids which are being placed on open sores, cuts and abrasions.

---

[18] Liza Gross, *These Everyday Toxins may be Hurting Pregnant Women and Their Babies*, NEW YORK TIMES (Sept. 23, 2020, updated Oct. 18, 2021) https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html.
[19] https://www.nytimes.com/2020/09/23/parenting/pregnancy/pfas-toxins-chemicals.html
[20] https://www.epa.gov/pfas/meaningful-and-achievable-steps-you-can-take-reduce-your-risk
(Last accessed October 24, 2022).

49.     Linda Birnbaum, Scientist Emeritus and Former Director of the National Institute of Environmental Health Sciences and National Toxicology Program & Scholar in Residence at Duke University, and Adjunct Professor at both University of North Carolina, & Yale University had this to say: "Because bandages are placed upon open wounds, it's troubling to learn that they may be also exposing children and adults to PFAS. It's obvious from the data that PFAS are not needed for wound care, so it's important that the industry remove their presence to protect the public from PFAS and opt instead for PFAS-free materials."[21]

50.     PFAS-containing products designed to be placed on the skin, such as Defendant's, have the potential to have prolonged contact with skin resulting in the harmful contacts being absorbed into one's blood stream.   Studies have shown PFAS containing products that have exposure to the skin are absorbed through the skin and cause health problems.[22] Moreover, PFAS containing products applied to the skin not only pose the same health hazards as ingesting the compound in water or food, but also cause further health harm such as immunosuppressive effects (suppression to vaccines).[23] Furthermore, studies have shown that harmful immune system effects from PFAS have been found even with relatively short and low exposure to PFAS and inherently have long term health damage due to PFAS being "forever chemicals."[24]

51.     There is no treatment to remove PFAS from the body.  Because PFAS accumulates in body tissues over time, the most obvious way to avoid exposure is for consumers to avoid products which they know contain PFAS;[25] however, in order to take those precautions, it is

---

[21] "BAND-AIDS" & BANDAGES WITH INCICATIONS OF PFAS "FOREVER CHEMICALS' REPORT https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html
[22] https://www.ewg.org/news-insights/news/study-pfas-exposure-through-skin-causes-harm-similar-ingestion
[23] Id.
[24] https://www.ewg.org/news-insights/news/pfas-chemicals-harm-immune-system-decrease-response-vaccines-new-ewg-review
[25] https://www.healthline.com/health-news/how-to-reduce-your-exposure-to-pfas-the-hidden-

incumbent upon manufacturers like Defendants to list on the products labeling and packaging that product contains or is at the risk of containing PFAS. Better yet the manufacturers should manufacture the products in the first instance without containing or being at the risk of containing PFAS.

52.    Defendants in this day and age are well aware of consumers' desire to avoid potentially harmful chemicals, including PFAS.

53.    Defendants have engaged in their uniform marketing campaign in an effort to convince reasonable consumers to believe that the Products are superior to other products and safe for use.

54.    Reasonable consumers purchasing the Products would believe, based on Defendants' representations, that the Products do not contain artificial, synthetic, or man-made chemicals that could adversely impact their health.

***Defendants' Unlawful Conduct***

55.    At all times relevant to this action, Defendants knew, or at minimum should have known, that their Products contained or were at the risk of containing PFAS.

56.    To capitalize on increasing consumer demand for products free from artificial ingredients, including harmful man-made chemicals like PFAS, Defendants have knowingly and willfully deployed a concerted strategy to distinguish their Products from competing options in the highly competitive healthcare industry by touting their Products as healthy and safe as a result of *inter alia* their quality assurance and manufacturing processes.

57.    Throughout the class period, Defendants have targeted health-conscious consumers by falsely and misleadingly representing the Products. Consequently, reasonable

---

toxic-forever-chemicals#How-to-limit-PFAS-exposure (Last accessed October 24, 2022).

consumers believe the Products are free of artificial, man-made chemicals known to harm human health, including PFAS.

58.     Defendants are well-aware that consumers are increasingly demanding options that support their health and wellness goals.

59.     At the same time, awareness of, and an inclination toward, safer products is guiding consumer choices.  One survey, for instance, found that "when asked to choose the top three factors they prioritize when deciding between products, the majority of consumers surveyed said they prioritize the health/safety of products (71%) and products free of certain toxic chemicals (70%)."[26]

60.     These findings extend to the packaging of products, with 82% of consumers agreeing that "it is important for brands to balance safety and concern for the environment when designing product packaging."[27]

61.     Additionally, "[t]he majority of shoppers . . . are willing to spend more for a product they know is safer, with 42% willing to spend 5-15% more, 36% willing to spend 16-25% more, and 17% willing to spend 1-5% more."[28]

62.     Therefore, current research demonstrates, and Defendants' marketing strategy supports, that the presence of harmful chemicals in food, beverages, healthcare and consumer products, as well as their packaging is material to reasonable consumers.

---

[26] Made Safe, "What Shoppers Want: Safe & Healthy Products," https://www.madesafe.org/wpconent/uploads/2017/07/What-Shoppers-Want.pdf (last visited Aug. 12, 2022).
[27] Gray, "New Consumer Packaging Trends Are Changing the Game for Food & Beverage Processors," https://www.gray.com/insights/new-consumer-packaging-trends-are-changing-thegame-for-food-beverage-processors/ (last visited Aug. 12, 2022).
[28] Made Safe, "What Shoppers Want," at 3.

63.     Defendants' strategy to stay aligned with consumer preferences in order to retain a competitive advantage in the marketplace, which includes representing to sell products which do not contain harmful artificial ingredients and chemicals, would inevitably be negatively impacted if it disclosed the presence of PFAS in their Products.

64.     Defendants knew that the presence of PFAS posed a concern with regard to the safety of the Products.  Despite this knowledge, Defendants failed to disclose the presence (or risk of presence) of PFAS in the Products.  Such omission was material to consumers.

65.      Consumers lack the expertise to ascertain the true ingredients in the Products prior to purchase.  Accordingly, reasonable consumers must, and do rely on Defendants to accurately and honestly advertise their Products' and not contradict those representations by using artificial man-made chemicals in their Products that are known to pose a risk to human health.  Such misrepresentations are material to reasonable consumers' purchasing decisions.

66.     Defendants' representations are likely to mislead reasonable consumers, and indeed did mislead Plaintiff and Class members, regarding the presence of (or risk of presence) PFAS chemicals in their Products.  Accordingly, these acts and practices by Defendants are deceptive.

67.     Consumers reasonably relied on Defendants' false statements and misleading representations, and reasonably expected that Defendants' Products would conform with their representations and, as such, would not contain (or be at risk of containing) artificial, man-made PFAS chemicals.

68.     Defendants' false statements, misleading representations and material omissions are intentional, or otherwise entirely careless, and render their Products worthless or less valuable.

69.     If Defendants had disclosed to Plaintiff and putative Class Members that their Products contained, or were at the risk of containing, PFAS chemicals, Plaintiff and putative Class Members would not have purchased Defendants' Products or they would have paid less for them.

70.     Plaintiff and Class Members were among the intended recipients of Defendants' deceptive representations and omissions described herein.

71.     Defendants' representations and omissions, as described herein, are material in that a reasonable person would attach importance to such information and would be induced to act upon such information in making purchase decisions.

72.     The materiality of the representations described herein also establishes causation between Defendants' conduct and the injuries Plaintiff and the Class Members sustained.

73.     Defendants are aware that consumers are concerned about the use of PFAS in their products, yet they have continued to market and advertise their Products in order to profit off of unsuspecting consumers, including Plaintiff and Class Members.

74.     The presence of PFAS chemicals in Defendants' Products are entirely inconsistent with their uniform representations.

75.     PFAS are present in Defendants' Products in a quantity which any reasonable person would consider to be significant.

76.     Defendants' knowingly false and misleading representations have the intended result of convincing reasonable consumers that their Products are without "chemical" or "artificial" ingredients and therefore do not contain artificial, man-made, toxic chemicals.  No reasonable consumer would consider purchasing Defendants' Products if they knew that the Products contained harmful, artificial PFAS chemicals.

77.     Defendants' false, misleading, and deceptive representations, as described herein, are likely to continue to deceive and mislead reasonable consumers and the general public. Indeed, they have already deceived and misled Plaintiff and Class Members.

78.     In making the false, misleading, and deceptive representations, Defendants knew and intended consumers would pay a premium for the Products over comparable products that are made from or contain synthetic or artificial ingredients.

79.     Further, and for the reasons contained herein, Defendants' Products are adulterated under 21 U.S.C. § 342(a)(1) of the United States Food, Drug and Cosmetic Act. ("FDCA").

80.     New York has expressly adopted the federal food labeling requirements as its own. Thus, a violation of federal food labeling laws is an independent violation of New York law and actionable as such.

81.     Plaintiff and Class Members all paid money for the Products, however, they did not obtain the full value of the advertised Products due to Defendants' misrepresentations as detailed herein. Plaintiff and Class Members purchased, purchased more of, or paid more for, the Products than they would have had they known the truth about the Products' artificial, man-made, and harmful ingredients. Thus, Plaintiff and Class Members have suffered injury in fact and lost money or property as a result of Defendants' wrongful conduct.

82.     Defendants' widespread marketing campaign portraying the Products as detailed herein, is misleading and deceptive to consumers because the Products are made with artificial, man-made, and toxic ingredients. Plaintiff brings this action on behalf of the proposed Classes to stop Defendants' misleading practices.

*Testing Confirms the Presence of PFAS Chemicals in the Product*

83.     Mamavation is a consumer group which aims to enable consumers to avoid the harms associated with PFAS chemicals by commissioning consumer studies on numerous products, including wound protection products.[29]

84.     In its study, Mamavation sent 40 bandages from 18 brands to an EPA-certified laboratory looking for indications of toxic PFAS "forever chemicals" by testing for organic fluorine, which is considered a marker for PFAS compounds and is a method of testing used to measure PFAS in other industries as well.  The study found that 65% of total bandages tested had indications of PFAS "forever chemicals," with 26 detections out of 40 bandages tested had organic fluorine above 10 parts per million (ppm) – ranging from 11 ppm to over 300 ppm.[30]

85.     Mamavation used total organic fluorine testing to detect organic fluorine in the band aids, which is the foundational element (and defining characteristic) of PFAS chemicals.

86.     Total organic fluorine testing is widely accepted by scientists, researchers, and regulators as the reliable method to detect a PFAS chemical in product samples.

87.     Because organic fluorine is the identifying element of PFAS chemicals and is present in all PFAS varieties, the detection of organic fluorine in a sample necessarily means that PFAS chemicals are present in some form.

88.     It is nearly impossible for total organic fluorine testing to yield a false positive detection of PFAS in a sample. Total organic fluorine testing only measures fluorine that originates from a substance where fluorine is attached to a carbon backbone. Therefore, total organic fluorine testing does not detect any other forms of fluorine, such as inorganic fluorine (i.e., fluoride).

---

[29] https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html
[30] https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html

89. Organic fluorine is not naturally present in the human body, and is practically nonexistent outside of its use in man-made PFAS chemicals.

90. Total organic fluorine analysis is typically reported in parts per million ("ppm"). By using the average proportion of organic fluorine in PFAS, organic fluorine concentration can also be used to provide an estimate of the maximum PFAS concentration in a sample. Some of Defendants' products, including the Products purchased by Plaintiff were included in the Mamavation study. The organic fluorine levels for the some of the Products were amongst the highest:

    a. Band-Aid Flexible Fabric Comfortable Protection Bandages (188 ppm organic fluorine on the absorbent pad);

    b. Band-Aid OURTONE Flexible Fabric BR45 Bandages (262 ppm organic fluorine on the absorbent pad);

    c. Band-Aid OURTONE Flexible Fabric BR55 Bandages (250 ppm organic fluorine on the absorbent pad);

    d. Band-Aid OURTONE Flexible Fabric BR65 Bandages (260 ppm organic fluorine on the absorbent pads and 374 ppm on the sticky flaps. 2nd product tested had 169 ppm on the absorbent pad);

    e. Band-Aid Water Block Tough-Strips Waterproof Adhesive Bandages (13 ppm organic fluorine in the sticky flaps).[31]

91. According to Scott Belcher, Ph.D. & Associate Professor with the Center for Environmental & Health Effects of PFAS at North Carolina State University, "fluoropolymers, such as polytetrafluoroethylene (PTFE), are extremely common forms of PFAS that could be contributing to the organic fluorine found in bandages. Methods used for detecting individual PFAS, such as PFOA or GenX, cannot directly identify PTFE; however, the analysis of total organic fluorine (TOF) does account for all PFAS contaminants in bandages, including PTFE.

---

[31] https://www.mamavation.com/health/band-aids-bandages-pfas-forever-chemicals-report.html

Therefore, this method of testing serves as a good 'spot-check' of consumer products."

92.    Plaintiff's independent testing also confirmed the presence of PFAS in the Products.

93.    Independent testing was conducted on the Product purchased by Plaintiff. The testing was performed according to industry testing standards by a laboratory accredited by an ISO accredited testing laboratory.

94.    This independent testing confirmed the presence in Plaintiff's Product of Perfluoro-n-hexanoic acid, Perfluorooctanesulfonic acid, Sodium dodecafluoro-3H-4, 8-dioxanonanoate and, worst of all, Perfluoro-n-octanoic acid.

95.    The detection of Perfluoro-n-octanoic acid, also known as "PFOA," is of particular concern as PFOA is widely thought to be the most dangerous PFAS.

96.    The International Agency for Research on Cancer ("IARC") of the World Health Organization ("WHO") has determined that "PFOA is carcinogenic to humans (Group 1), on the basis of sufficient evidence for cancer in experimental animals and strong mechanistic evidence (for epigenetic alterations and immunosuppression) in exposed humans."[32]

**PLAINTIFF'S FACTUAL ALLEGATIONS**

97.    Plaintiff is a citizen and resident of the state of New York. During the applicable statute of limitations period, Plaintiff purchased and consumed Defendants' Band-Aid OURTONE Flexible Fabric BR45 and Band-Aid Water Block Tough-Strips Waterproof Adhesive Bandages Products, which testing confirmed contained PFAS. More specifically, over the last two years,

---

[32] https://www.iarc.who.int/news-events/iarc-monographs-evaluate-the-carcinogenicity-of-perfluorooctanoic-acid-pfoa-and-perfluorooctanesulfonic-acid-pfos/ (Last accessed January 22, 2024).

Plaintiff purchased Defendants' Products various brick and mortar retail locations throughout Brooklyn, New York, including Walgreens. Plaintiff purchased the Products because Plaintiff believed that the Products were safe for use on the human body and did not contain harmful PFAS chemicals that were not listed anywhere on the Products packaging. If the Products did not contain harmful PFAS, Plaintiff would purchase the Products in the immediate future.

98.    Prior to her purchase, Plaintiff reviewed the labeling, packaging, and marketing materials of her Products, including those set out herein. Thus, Plaintiff understood that based on Defendants' claims, the Products were safe for use and thus were free of harmful, man-made chemicals like PFAS. Plaintiff reasonably relied on these representations and warranties in deciding to purchase the Products, and these representations were part of the basis of the bargain in that she would not have purchased the Products, or would not have purchased it on the same terms, if the true facts had been known.

99.    As a direct result of Defendants' material misrepresentations and omissions, Plaintiff suffered and continues to suffer, economic injuries.

100.    Plaintiff continues to desire to purchase the Products from Defendants if she can rely on that Products to be safe and free from any artificial ingredients, including those known to pose a risk to human health. However, concerned about the health consequences of PFAS and Defendants' misrepresentations detailed herein, Plaintiff is unable to determine if Defendants' Products are actually free of harmful chemicals like PFAS in the future. Plaintiff understands that the composition of the Products may change over time, but as long as Defendants may freely advertise the Products as safe when they actually contain material levels of PFAS, then when presented with false or misleading information when shopping, she will be unable to make informed decisions about whether to purchase Defendants' Products and will be unable to evaluate

the different prices between Defendants' Products and competitor's products, which *are* in fact free of PFAS.

101.    Plaintiff also seeks to include an injunction to require the implementation and funding of a blood serum testing program for the Plaintiff and Class Members to test for the presence of PFAS in their blood serum; and the implementation and funding of a medical monitoring program for Plaintiff and Class Members sufficient to monitor Plaintiff and Class Members' health to ensure they are adequately monitored for the harmful effects of PFAS in the human body.

**INJURY TO THE PUBLIC AT-LARGE AND POTENTIAL FOR FUTURE HARM**

102.    Defendants' wrongful conduct harms the public-at-large.

103.    PFAS chemicals, also known as "forever chemicals," are a category of highly persistent and toxic man-made chemicals that have been associated with numerous negative health effects for humans.

104.    PFAS chemicals are known to negatively impact the human body, including, but not limited to, decreased fertility, developmental effects or delays in children, increased risk of cancers, liver damage, increased risk of asthma and thyroid disease, adverse impacts on the immune system, interference with hormones and increased cholesterol levels.

105.    Because Defendants' deceptive advertising is ongoing and directed to the public, and because Defendants continue to sell their Products containing PFAS chemicals, the deception poses an ongoing risk to the public.

106.    As such, a public injunction must be provided in order to enjoin Defendants' continued harm of consumers and the public-at-large.

## **TOLLING AND ESTOPPEL OF STATUTE OF LIMITATIONS**

107.     Defendants had actual knowledge that their Products contained artificial, man-made PFAS chemicals which pose a risk of harm to human health.

108.     Although Defendants were aware of the deception in their advertising, marketing, packaging, and sale of the Products given the inclusion of PFAS chemicals, it took no steps to disclose to Plaintiff or Class Members that their Products contained PFAS chemicals.

109.     Despite their knowledge, Defendants have negligently misrepresented the Products as having qualities and characteristics they do not, while concealing the fact that their Products contain PFAS chemicals.

110.     Defendants made, and continue to make, affirmative false statements and misrepresentations to consumers, and continue to omit the fact that the Products contain PFAS, to promote sales of their Products.

111.     Defendants misrepresented, concealed, and otherwise omitted material facts that would have been important to Plaintiff and Class Members in deciding whether to purchase the Products.  Defendants' misrepresentations and omissions were knowing, and it intended to, and did, deceive reasonable consumers, including Plaintiff and Class Members.  Accordingly, Plaintiff and Class Members reasonably relied upon Defendants' misrepresentations and concealment of these material facts and suffered injury as a proximate result of that justifiable reliance.

112.     The PFAS chemicals in the design and/or manufacture of Defendants' Products were not reasonably detectible to Plaintiff and Class Members.

113.     At all times, Defendants actively and intentionally misrepresented the qualities and characteristics of the Products, while concealing the existence of the PFAS chemicals and failing to inform Plaintiff or Class Members of the existence of the PFAS chemicals in their Products.

Accordingly, Plaintiff's and Class Members' lack of awareness was not attributable to a lack of diligence on their part.

114.    Defendants' statements, words, and acts were made for the purpose of deceiving the public, and suppressing the truth that the Products contained artificial, man-made PFAS chemicals.

115.    Defendants misrepresented the Products and concealed the PFAS chemicals for the purpose of delaying Plaintiff and Class Members from filing a complaint on their causes of action.

116.    As a result of Defendants' intentional misrepresentations and active concealment of the PFAS chemicals and/or failure to inform Plaintiff and Class Members of the PFAS chemicals, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.  Furthermore, Defendants are estopped from relying on any statutes of limitations in light of their intentional misrepresentations and active concealment of the inclusion of artificial, man-made PFAS chemicals in the Products.

117.    Further, the causes of action alleged herein did not occur until Plaintiff and Class Members discovered that the Products contained PFAS chemicals.  Plaintiff and Class Members had no realistic ability to discern that the Products contained PFAS chemicals until they learned of the existence of the PFAS chemicals.  In either event, Plaintiff and Class Members were hampered in their ability to discover their causes of action because of Defendants' active concealment of the existence and true nature of the Products.

## FEDERAL RULE OF CIVIL PROCEDURE 9(b) ALLEGATIONS

118.    Although Defendants are in the best position to know what content it placed on their packaging, website(s), and other marketing and advertising during the relevant timeframe, and the knowledge that it had regarding the PFAS chemicals and their failure to disclose the

existence of PFAS chemicals in the Products to Plaintiff and consumers, to the extent necessary, Plaintiff satisfies the requirements of Rule 9(b) by alleging the following facts with particularity:

119.    **WHO**: Defendants made their representations on the Products' packaging, online, and their marketing and advertising of the Products.

120.    **WHAT**: Defendants' conduct here was, and continues to be, deceptive and negligent because of their representations.  Thus, Defendants' conduct deceived Plaintiff and Class Members into believing that the Products were manufactured and sold with the represented qualities.  Defendants knew or should have known this information is material to reasonable consumers, including Plaintiff and Class Members in making their purchasing decisions, yet it continued to pervasively market the Products as possessing qualities they do not have.

121.    **WHEN**: Defendants made material misrepresentations, false statements and/or material omissions during the putative Class periods and at the time Plaintiff and Class Members purchased the Products, prior to and at the time Plaintiff and Class Members made claims after realizing the Products contained artificial, man-made chemicals, and continuously throughout the applicable Class periods.

122.    **WHERE**: Defendants' marketing message was uniform and pervasive, carried through false statements, misrepresentations, and/or omissions on the Products' packaging, as well as on website(s) and social media channels used to market and advertise the Products.

123.    **HOW**: Defendants made false statements, misrepresentations and/or material omissions regarding the presence of PFAS chemicals in the Products.

124.    **WHY**: Defendants made the false statements, misrepresentations and/or material omissions detailed herein for the express purpose of inducing Plaintiff, Class Members, and all reasonable consumers to purchase and/or pay for the Products over other brands that did not make

similar representations, the effect of which was that Defendants profited by selling the Products to many thousands of consumers.

125.    **INJURY**: Plaintiff and Class Members purchased, paid a premium, or otherwise paid more for the Products when they otherwise would not have, absent Defendants' misrepresentations, false and misleading statements.

## CLASS ACTION ALLEGATIONS

126.    Plaintiff brings this action individually and as the representative of all those similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of the below-defined Classes:

> **National Class**: During the fullest period allowed by law, all persons who purchased the Products within the United States for personal use and not for resale.

> **New York Subclass**: During the fullest period allowed by law, all persons who purchased the Products within the state of New York for personal use and not for resale.

127.    Members of the classes described are referred to herein as "Class Members" or members of the "Class."

128.    Plaintiff reserves the right to amend the Class definitions or add a Class or Classes if discovery and/or further investigation reveal that the Class definition(s) should be narrowed, expanded or otherwise modified.

129.    The following are excluded from the Class: (1) any Judge presiding over this action and members of his or her family; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest (as well as current or former employees, officers, and directors); (3) persons who properly execute

and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

130. **Numerosity – Federal Rule of Civil Procedure 23(a)(a)**: While Plaintiff does not know at this time the exact number of proposed Class Members, given the nature of the claims and the volume of sales of the Products nationally, the members of the Class are so numerous that their individual joinder herein is impracticable. Plaintiff is informed and believes that there are tens of thousands of members in the proposed Class, if not more, and a precise number can be ascertained through discovery. The number of individuals who comprise the Class are so numerous that the disposition of all such person's claims in a class action, rather than in individual actions, will benefit both the parties and the courts.

131. **Commonality and Predominance – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3)**: Common questions of law and fact exist as to all members of each of the Class and predominate over questions affecting only individual members of the Class. Such common questions of law or fact include, but are not limited to, the following:

    a.    Whether Defendants misrepresented, omitted, and/or failed to disclose material facts concerning the Products;

    b.    Whether Defendants' conduct was unlawful, unfair, negligent and/or deceptive;

    c.    Whether Defendants breached express warranties to Plaintiff and Class Members;

    d.    Whether Defendants were unjustly enriched as a result of the unlawful conduct alleged herein such that it would be inequitable for Defendants to retain the benefits conferred upon it by Plaintiff and the proposed Class;

    e.    Whether Plaintiff and the Class have sustained damages with respect to the claims asserted, and if so, the proper measure of their damages.

Defendants engaged in a common course of conduct giving rise to the legal rights Plaintiff seeks to enforce on behalf of herself and the other Members of the proposed Class. Similar or identical statutory and common law violations, business practices, and injuries are involved. Individual questions, if any, pale in comparison, in both quality and quantity, to the numerous common questions that dominate this action.

132. **Typicality – Federal Rule of Civil Procedure 23(a)(3)**. Plaintiff's claims are typical of the claims of the other Members of the Class because, among other things, all Members of the Class were comparably injured through Defendants' uniform misconduct described herein. Further, there are no defenses available to Defendants that are unique to Plaintiff or to any particular Members of the Class.

133. **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff is an adequate Class representative because her interests do not conflict with the interests of the other Members of the Class she seeks to represent; she has retained counsel competent and experienced in complex class action litigation; and she will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and the undersigned counsel.

134. **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a representative class action, Members of the Class would continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, substantially impeding their ability to protect their interests, while establishing incompatible

standards of conduct for Defendants.  The proposed Classes thus satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

135.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Members of the Class are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for Members of the Class to individually seek redress for Defendants' wrongful conduct.  Even if Members of the Class could afford individual litigation, the court system could not.  Individualized litigation would create a potential for inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
**Violation of the New York Deceptive Trade Practices Act,**
**New York Gen. Bus. Law § 349, *et seq.***
**(Plaintiff on behalf of the New York Subclass)**

136.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

137.    The New York General Business Law Section 349 ("GBL § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state . . ."

138.    Defendants misleadingly, inaccurately, and deceptively advertise and market their Products to consumers.

139.    Defendants' improper consumer-oriented conduct—including labeling and advertising the Products —is misleading in a material way in that it, *inter alia*, induced Plaintiff and the New York Subclass Members to purchase and pay a premium for Defendants' Products and to use the Products when they otherwise would not have.  Defendants made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

140.    Plaintiff and the New York Subclass Members have been injured inasmuch as they paid a premium for Products that were - contrary to Defendants' representations—and did contain dangerous levels of the man-made chemical PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

141.    Defendants' advertising and Products' packaging and labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Products and to pay a premium price.

142.    Defendants' deceptive and misleading practices constitute a deceptive act and practice in the conduct of business in violation of New York General Business Law §349(a) and Plaintiff and the New York Subclass Members have been damaged thereby.

143.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and the New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

144.    In addition, Plaintiff and Class Members seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

145.    Finally, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

**<u>COUNT II</u>**
**Violation of the New York Deceptive Trade Practice Act,**
**New York Gen. Bus. Law § 350, *et seq.***
**(Plaintiff on behalf of the New York Subclass)**

146.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

147.    The N.Y. Gen. Bus. Law § 350 provides, in part, as follows:

False advertising in the conduct of any business, trade, or commerce or in the furnishing of any service in this state is hereby declared unlawful.

148.    N.Y. Gen. Bus. Law § 350a(1) provides, in part, as follows:

The term 'false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual . . .

149.    Defendants' labeling and advertisements contain untrue and materially misleading statements and omissions concerning Defendants' Products inasmuch as they misrepresent that the Products are free of PFAS.

150.    Plaintiff and the New York Subclass Members have been injured inasmuch as they relied upon the labeling, packaging, and advertising and paid a premium for the Products which were—contrary to Defendants' representations—did contain dangerous levels of PFAS. Accordingly, Plaintiff and the New York Subclass Members received less than what they bargained and/or paid for.

151.    Defendants' advertising, packaging, and Products' labeling induced Plaintiff and the New York Subclass Members to buy Defendants' Products.

152.    Defendants made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

153.    Defendants' conduct constitutes multiple, separate violations of N.Y. Gen. Bus. Law § 350.

154.    Defendants made the material misrepresentations described in this Complaint in Defendants' advertising and on the Products' packaging and labeling.

155.    Defendants' material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large.  Moreover, all consumers purchasing the Products were and continue to be exposed to Defendants' material misrepresentations.

156.    As a result of Defendants' recurring, "unlawful" deceptive acts and practices, Plaintiff and New York Subclass Members are entitled to monetary, statutory, compensatory, treble and punitive damages, restitution, and disgorgement of all moneys obtained by means of Defendants' unlawful conduct, interest, and attorneys' fees and costs.

157.    In addition, Plaintiff and Class Members seek equitable and injunctive relief against Defendants on terms that the Court considers reasonable, and reasonable attorneys' fees and costs.

158.    Finally, Defendants' conduct showed malice, motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

### COUNT III
**Unjust Enrichment**
**(In the Alternative and on Behalf of the Class)**

159.    Plaintiff repeats and re-alleges the allegations above as if set forth herein.

160.    At all relevant times, Defendants were responsible for designing, constructing, testing, manufacturing, inspecting, distributing, labeling, marketing, advertising, and/or selling the Products and their packaging. At all relevant times, it was reasonably foreseeable by Defendants

that the use of the Products in their intended manner involved substantial risk of injury and was unreasonably dangerous to Plaintiff and the Class as the ultimate users of the Products.

161.    At all relevant times, Defendants knew or had reason to know of the risk of injury and the resultant harm that the Products posed to Plaintiff and Class Members, as the Defect existed at the time of their design, construction, manufacture, inspection, distribution, labeling, marketing, advertising, and/or sale, as described herein.

162.    Defendants as the designer, manufacturer, tester, distributor, marketer, advertiser, and/or seller of the Products, had a duty to warn Plaintiff and the Class of all dangers associated with the Products.

163.    At minimum, the duty arose for Defendants to warn consumers that use of the Products could result in injury and was unreasonably dangerous.

164.    Defendants have been unjustly enriched in retaining the revenues derived from the purchases of the Products by Plaintiff and the other members of the Class.  Retention of those monies under these circumstances is unjust and inequitable because Defendants' representations regarding the quality or value of the Products were misleading to consumers, which caused injuries to Plaintiff and the other members of the Class, because they would have not purchased the Products had they known the truth or would only have purchased the Products for a lower price.

165.    Because Defendants' retention of the non-gratuitous benefits conferred on it by Plaintiff and the other members of the Class is unjust and inequitable, Defendants must pay restitution to Plaintiff and the other members of the Class for their unjust enrichment, as ordered by the Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated members of the Class, prays for relief and judgment, including entry of an order, as follows:

(a) Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

(b) Directing that Defendants bear the costs of any notice sent to the Class;

(c) Ordering Defendants to pay restitution to Plaintiff and the Class;

(d) An Order requiring Defendants to establish a blood testing program for Plaintiff and the Class, as well as to establish a medical monitoring protocol for Plaintiff and the Class to monitor individuals' health and diagnose at an early stage any ailments associated with exposure to PFAS;

(e) A jury trial and damages according to proof;

(f) Awarding actual damages to Plaintiff and the Class;

(g) Awarding Plaintiff and members of the Class statutory damages, as provided by the applicable state consumer protection statutes invoked above;

(h) Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class;

(i) Civil penalties, prejudgment interest and punitive damages as permitted by law; and

(j) Ordering such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial of the claims asserted in this Class Action Complaint.

Dated: July 5, 2024

Respectfully submitted,


**SULTZER & LIPARI, PLLC**

Jason P. Sultzer /s/

By: _____

Jason P. Sultzer, Esq.
Daniel Markowitz, Esq.
85 Civic Center Plaza, Suite 200
Poughkeepsie, NY 12601
Tel: (845) 483-7100
Fax: (888) 749-7747
sultzerj@thesultzerlawgroup.com
markowitzd@thesultzerlawgroup.com

Charles E. Schaffer, Esq.
LEVIN SEDRAN & BERMAN LLP
510 Walnut St., Suite. 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663
cschaffer@lfsblaw.com

Marlene J. Goldenberg, Esq.
Samantha V. Hoefs, Esq.
NIGH GOLDENBERG RASO & VAUGHN PLLC
14 Ridge Square NW, Third Floor
Washington, DC 20016
Tel. (202) 978-2228
Fax: (202) 792-7927
mgoldenberg@nighgoldenberg.com
shoefs@nighgoldenberg.com

*Counsel for Plaintiff and the Class*